

**FILED**
JAN - 7 2005
J. T. NOBLIN, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NUMBER: 2:05mj3

CHARLES WALKER

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about January 7, 2005, in Forrest County, in the Southern District of Mississippi, and elsewhere, defendant did, violate Title 18, United States Code, Section 1956(a)(3) in that he knowingly and willfully conducted or attempted to conduct financial transactions involving property represented to be the proceeds of drug smuggling activity for the purpose of concealing or disguising the nature, location, source, ownership or control of property believed to be the proceeds of the specified unlawful activity.

I further state that I am a(n) Agent with the United States Immigration and Customs Enforcement and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  _X_ Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

01/07/05         at  Gulfport, Mississippi
Date

_____
JOHN M. ROPER
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

STATE OF MISSISSIPI            )
COUNTY OF FORREST              :   **AFFIDAVIT**
SOUTHERN DISTRICT OF MISSISSIPPI   )

I, Robert Burns, being duly sworn, hereby depose and state

That:

1. I, Robert Burns, your affiant herein, am a Special Agent with the Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE), duly appointed according to the law acting as such. I have been a Special Agent for approximately 12 months. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrest for offenses enumerated in Title 18, United States Code, section 1956.

2. Prior to my employment with this agency, I received a Bachelor of Science Degree in Criminal Justice. Upon completion of my college education, I attended a ten week Law Enforcement Training Academy and on completion was hired and worked for the Panola-Tate Narcotics Task Force in the State of Mississippi for approximately four years. I also attended a seven-week specialized training for the Mississippi Bureau of Narcotics and worked as a special agent for the Mississippi Bureau of Narcotics for an additional four years. I attended the Federal Law Enforcement Training Center in Glynco, Georgia, for 22 weeks, during which time I was cross-trained as an ICE

Special Agent. This training included both customs and immigration law, investigative procedures, case management, date systems, document examination, and court procedures. Following my graduation from the Federal Law Enforcement Training Center, I was assigned to the office of the Special Agent in Charge, New Orleans. Louisiana, Port Security Group. Among other duties, I am now conducting an investigation involving alleged Money Laundering activities.

3. Beginning in July 2004, the Office of the Special Agent in Charge, New Orleans, Louisiana (SAC/NO), Port Security Group (PSG), initiated an investigation of the criminal activities of **Charles WALKER,** resident of Petal, Mississippi. An ICE Undercover Special Agent (U/C) has had several meetings and approximately nineteen telephone conversations with **WALKER** for the purpose of laundering represented drug smuggling proceeds. Some of those meetings and phone conversations are specified below.

4. On October 5, 2004, an Operation Skymaster U/C agent met with Charles **WALKER** in Hattiesburg, Mississippi for the purposes of discussing **WALKER'S** interest and ability to launder represented smuggling proceeds for the U/C agent. **WALKER** agreed to assist the U/C agent and discussed the possibility of **WALKER** employing U/C agent as a consultant for one of **WALKER'S** "paper companies". **WALKER** also agreed to pay the U/C agent with the U/C's own money in exchange for a ten percent fee for **WALKER**. For example, the U/C agent would give **WALKER** cash represented to be illegally obtained drug smuggling proceeds and **WALKER** would run the

money through his own accounts and pay the U/C agent with the original money.

5. On November 9, 2004 U/C agent met with **WALKER** at the Bobbie Chain airport located in Hattiesburg, Mississippi:

   a. During the recorded meeting, U/C agent informed **WALKER** that he was picking up $50,000 and that the $50,000 needed to be shown as legitimate income. U/C agent further informed **WALKER** that he would have an additional $50,000 in the near future that would also need to be shown as income.

   b. **WALKER** agreed to take the $50,000 and explained that the U/C agent will be shown as a pilot/consultant for the POLARIS Corporation and has also agreed to give U/C agent Wyatt an employment contract for the purpose of showing a source of income. **WALKER** explained to the U/C agent that he would create a corporation for the U/C agent and give the corporation a tax number. In return, **WALKER** would retain a 10 percent fee in the amount of $5,000 dollars for his money laundering services.

6. On November 17, 2004 during a recorded phone conversation between **WALKER** and the U/C agent, **WALKER** agreed to supply U/C agent with a fictitious employment contract in return for $5,000. **WALKER** and the U/C agent agreed that the fictitious employment contract would reflect that the U/C agent has earned $45,000 dollars as a pilot/consultant for POLARIS.

7. On November 18, 2004, U/C agent met with **WALKER** at Bobbie Chain Airport located in Hattiesburg, Mississippi:

    a. During the recorded meeting, U/C agent received a fictitious employment contract from **WALKER** that read that U/C agent has earned $45,000 as a pilot/consultant for POLARIS. In return for **WALKER** drafting the contract that was intended to make $45,000 appear to have been earned legitimately, U/C agent Wyatt paid **WALKER** a ten-percent fee in the amount of $5,000. The $5,000 was concealed in a box of "Bounce" fabric softener. The U/C agent informed **WALKER** that the money was wrapped in bounce to conceal the scent of drugs from "dope sniffing dogs".

    b. U/C agent then discussed with **WALKER** the possibility of purchasing property for the purpose of laundering the U/C agent's represented illegal proceeds.

8. On November 26, 2004 the U/C agent received an express mail package sent from **WALKER** containing appraisals on the property for the purpose of legitimizing the U/C agent's represented illegally obtained proceeds.

9. On December 8, 2004 the U/C agent met with **WALKER** in Petal, Mississippi:

    a. During the recorded meeting, **WALKER** directed the U/C agent to several properties owned by **WALKER** located in the Hattiesburg, Mississippi area to be purchased with the U/C agent's represented drug smuggling proceeds. **WALKER** and the U/C agent discussed future plans to complete the sale of **WALKER'S** property and set a

        date tentatively for January 7, 2005. The U/C agent and **WALKER** agreed that during closing, a check will be provided for the property and at a later time on the same day **WALKER** would return the check to the U/C agent in exchange for cash (a large sum in small and large bills).

b.    The U/C agent and **WALKER** arrived at **WALKER'S** RV located at 120 S. George Street, Petal, Mississippi. The U/C agent gave **WALKER** $50,000 of represented smuggling proceeds and in exchange the U/C agent received a wire transfer from **WALKER** in the amount of $10,000 to an undercover bank account. The $50,000 was concealed in a paper bag and wrapped in "Bounce" fabric softener to conceal the scent of drug residue. (Note: Prior to this meeting, during a consensually monitored telephone call, **WALKER** asked the U/C agent if depositing the money in a bank would create a problem and the U/C agent informed **WALKER** that the only problem would be with dope sniffing dogs. The U/C agent received three separate checks provided by **WALKER** from the following accounts: INTERNATIONAL CHRISTIAN CHURCH in the amount of $7,000, CHARLES C. OR DELORIS M. WALKER in the amount of $8,000 and INTERNATIONAL CHEKCER HALL OF FAME in the amount of $20,000. **WALKER** stated "I'll just give you checks for the difference and you can deposit it. See that'll be better on me then I can spread it out in different accounts".

  c. **WALKER** also provided a fictitious employment contract that read that the U/C agent has earned $45,000 as a pilot/consultant for POLARIS. In return for **WALKER** drafting the contract that was intended to make $45,000 appear to have been earned legitimately, U/C agent paid **WALKER** a ten-percent fee in the amount of $5,000.

  d. **WALKER** provided the U/C agent with a document from the IRS that contained an Employer Identification number for LITTLE AVIATION & COURIER SERVICE, a corporation established by **WALKER** for the U/C agent. **WALKER** also provided documents to establish an offshore bank account in Nevis. **WALKER** explained to the U/C agent "you need to open up an account in the aviation. You can write bigger checks to business that you can to individuals".

  e. During the undercover meeting **WALKER** made several trips from his RV to his office to retrieve documents for the U/C agent.

10. On December 9, 2004 at approximately 0900 hours, during a recorded phone conversation U/C agent and **WALKER** arranged to meet in Gulfport, Mississippi on the 8th of January 2005 to complete the sale of **WALKER'S** property. **WALKER** told the U/C agent "I really need is larger bills. Hundreds if possible on that because you know I need to store them".

11. Based on the foregoing, your affiant believes that there exists sufficient probable cause to believe that **Charles WALKER** is currently involved in

committing financial related crimes, specifically that of Title 18, United States Code 1956, Money Laundering. As a result, your affiant respectfully requests that a warrant be issued in the Southern District of Mississippi for the arrest of **Charles WALKER** for violations of Title18, United States Code, Section 1956, (Money Laundering).

ROBERT BURNS

Special Agent

U.S Immigration Customs Enforcement

Subscribed and sworn to me this the ___ day of January 2005.

United States Magistrate Judge